Voll, Respondent, vs. Industrial Commission and another, Defendants: Island Woolen Company, Appellant.

*October 10—November 4, 1941.*

For the appellant there was a brief by *Wilkie, Toebaas, Hart, Kraege & Jackman* of Madison, and oral argument by *Oscar T. Toebaas*.

For the respondent there was a brief by *Hill, Miller & Hill* of Baraboo, and oral argument by *James H. Hill*.

MARTIN, J.   The only question involved in this appeal is whether or not the employee's injury was caused by the failure of appellant as employer to comply with any statute or any lawful order of the Industrial Commission, so as to subject the employer to a penalty of fifteen per cent additional compensation.

It is conceded that appellant did not violate any safety order of the commission.   It is further conceded that plaintiff was entitled to the compensation awarded for permanent total disability.   Appellant contends that the injury was due to a sudden, unexpected flash-fire.   Appellant denies that the injury was caused by any failure on its part to comply with any statute relating to safe place or safe employment.

Sec. 101.06, Stats., relative to employer's duty to furnish safe employment and place, provides:

"Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing

reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building, and every architect shall so prepare the plans for the construction of such place of employment or public building, as to render the same safe."

Sec. 101.01 (11), Stats., defines the words "safe" and "safety" as follows:

"The term 'safe' or 'safety' as applied to an employment or a place of employment or a public building, shall mean such freedom from danger to the life, health, safety or welfare of employees or frequenters, or the public, or tenants, or firemen, and such reasonable means of notification, egress and escape in case of fire, and such freedom from danger to adjacent buildings or other property, as the nature of the employment, place of employment, or public building, will reasonably permit."

In *Olson v. Whitney Bros. Co.* 160 Wis. 606, 610, 150 N. W. 959, the court said:

"Our present statute recognizes the 'rule of reason' and does not impose upon an employer an impossibility or an unreasonable burden. Under either law if the employer has failed to meet the statutory requirement, if there be no other defense, he is absolutely liable. But if he has met the statutory requirement; if his place of employment is safe within the statutory definition, then he cannot be held liable on account of its condition though it may not be safe in the original technical sense of the term."

At pp. 612 and 613 the court said:

"Places of employment and appliances are safe within the meaning of the statute when they are so constructed and in such condition that, considering the nature of the employment conducted in them and the manner in which it is customarily carried on, or the manner in which an ordinarily careful and prudent man may reasonably anticipate it might be conducted,

and considering the use the appliances are, with the knowledge of the employer, being put to, or the use which an ordinarily careful and prudent person may reasonably anticipate they might be put to, they are as free from danger as such employment and such use will reasonably permit. *Montevilla v. Northern F. Co.* 153 Wis. 292, 141 N. W. 279; *Kendzewski v. Wausau S. F. Co.* 156 Wis. 452, 146 N. W. 516. In other words, safety is not an absolute, fixed term, but a relative one, being always measured by the kind of employment and the manner in which it is customarily carried on and by the use appliances are, with the knowledge of the employer, being put to, or which an ordinarily prudent person might reasonably anticipate they may be put to. . . . The statute places no heavier duty upon him than to make the place of employment for *his* work as free from danger as the nature of it will reasonably permit."

The findings of the examiner are as follows:

"That applicant [Voll] sustained injury on August 8, 1932, while spreading cotton and wool stock in a bin, into which the stock was being delivered by a blower system, the outlet of which was approximately in the center of the bin and about 8 feet above the floor. The bin was 14 feet long, 6 feet wide, and 10 feet from floor to ceiling. It was inclosed to a height of 4 feet by solid walls and above them to the ceiling extended on all sides a wire screen with a quarter inch mesh. Access to the bin was had by a sliding door, 46 inches wide and 6½ feet high, located in the center of the west wall of the bin.

"While applicant was engaged in spreading and tramping down the stock in the bin, a sudden explosive flash-fire occurred, severely burning him about the hands, arms, face, head, and neck. The exact cause of the explosion is unknown. No similar flash-fire had occurred in respondent's plant in over thirty years of operation of the blower method of filling bins. The heat generated by the flash-fire was such that almost immediately the sprinkler heads in the bin were set off and the two sprinklers there began to operate. It is found that applicant's injuries were caused by the sudden flash-fire to which he was exposed; that the mere instantaneous ex-

posure to such a fire was sufficient to cause and did cause applicant's injuries; that the presence of a quick means of escape from the bin would not have prevented applicant's injuries.

"No claim is made that any safety order of the industrial commission is here involved, and it is found that injury did not occur by reason of respondent's failure to comply with any safety order of the industrial commission.

"The examiner further finds that the transfer of stock by the blower method had long been used in respondent's plant and in the industry generally; that experience with that method had not been such as to indicate any hazard from explosive flash-fires; that the work which applicant was doing at the time of his injury was as free from danger as the nature of his work would reasonably permit.

"It is therefore concluded that injury did not occur by reason of respondent's failure to comply with any of the provisions of the so-called safe-place statute.

"For conceded permanent total disability, applicant is entitled to compensation for a period of eight hundred thirty-eight weeks at the weekly rate of $13.40, amounting to the sum of $11,229.20, payable at the rate of $58.07 per month. It appears that regular monthly payments of $58.07 have been made by the insurance carrier since the date of applicant's injury.

"It is concluded that no compensation benefits, except medical, can be awarded in excess of the allowance for permanent total disability and that therefore applicant's additional claim for disfigurement must fail."

On application for review by the Industrial Commission, the commission as a whole affirmed the findings of fact and order of the examiner.

The respondent argues that the employment and the place of employment were not safe; that the method and process used were not reasonably adequate to render the employment and place of employment safe. It appears without dispute that over a period of forty years of operation this was the only flash-fire which occurred in defendant's plant. It is

claimed that the sliding door of the bin should have had an inside handle on the door and that the lack of such handle was a violation of the safe-place statute.

The operation at appellant's plant was in brief as follows: It purchases cotton waste, rayon, and wool stock from different mills, which is shipped in bales. When these bales are received they are placed in the picker house where they are broken open; and the material is then run through a picking machine where it is combed into fine and feathery stuff. From the picker the material is carried through pipes by a blower system in the bins located on the floor above. There are seventeen bins in all, which are located along one of the walls in the carding room. Opposite the bins are carding machines. There is a forty-inch aisle between the bins and the carding machines to give room for taking stock out of the bins and feeding the carder.

The bin in which plaintiff was at work when the accident occurred was sixteen feet wide, fourteen feet long, and ten feet high. The bins are inclosed with metal or sheet iron up to a height of four feet from the floor. Above that to the ceiling is heavy screen mesh. Access to the bin was through a sliding door, the lower four feet of which is made of wood, and from there up, of wire screen of quarter-inch mesh. The door was forty-six inches wide, six feet five inches high. The door slides on the floor between strips which keep it in place, and is located in the wall of the bin next to the aisle.

The blower pipes run through the bins near the top of the ceiling. There is an opening in the pipe for each bin which can be opened or closed with a shutter. The material is forced through these pipes by means of a blower system. Throughout the carding room there is installed an overhead sprinkler system, valves about six feet apart. Two such valves were located alongside the blower pipe in the bin in which plaintiff was working at the time in question. At 155 degrees the valves open and discharge water.

Plaintiff testified that he had worked for appellant in these bins hundreds of times since 1922; that at the time in question he was in the bin distributing the material as it came from the blower; that the air was filled with particles of fabric; that as he distributed the material he tramped it down; that he stooped down on one knee, kneeling against his fork, and as he was about ready to tramp it down again he heard some noise in the blower—like something striking it; that as he looked over his shoulder there was fire up to the ceiling; that he could not say whether the bin was full of fire, but he made a dive for the door; that he got to the door but did not have the fork and could not open the door; that he started back to look for the fork and then there was fire to the door; that he usually used the fork to open the door by sticking the fork into the mesh, opening it sufficiently to get his hand in and push it back.

He further testified that from the time he heard the noise of something striking against the blower until he got burned, the whole thing happened very suddenly.

The attending physician testified that in taking plaintiff's history of the accident plaintiff told him that there was a sudden blast of flame from somewhere, a sudden blast of fire, and he pitched forward into the pile of shoddy that was there. The doctor was asked:

"*Q.* Would a sudden blast of fire coming in contact with a man be sufficient to produce the burns that Mr. Voll sustained? *A.* It would.

"*Q.* In case of fire in the nature of a sudden flash of fire, and it comes in contact with the exposed parts of a person's body, like his hands and face, would a sudden flash-fire be sufficient to burn the face as badly as Mr. Voll's face and hands were burned? *A.* It would."

Mr. Coates, a witness for the applicant, at the hearing before the Industrial Commission examiner, testified that on the day of the accident about sixty per cent of the material

was cotton fibre which filled the air with fine particles; that it was the material floating in the air that burned; that very little of the surface stuff that had settled down burned; that his attention was attracted by a flash—as though some one had turned on all the lights in the room at once, a crash and a sound, a poof like a small explosion; that at the time he was facing the bin in which plaintiff was working; that when he saw or heard this poof the whole bin was full of fire; that the fire was so dense he could not see through the wire mesh and did not see Mr. Voll in the bin; that he hollered "fire" and grabbed a fire extinguisher, but by the time he got to the bin the sprinklers had melted and everything was black with smoke; that he could not see anything.

He further testified that the paint on the walls and ceiling of the bin did not burn; that it was the fine material floating in the air that burned; that he had worked for appellant since April, 1921, and had never seen a like flash-fire.

Mr. Dibble, a witness for the employer, testified that when the accident occurred he was facing the bin about forty feet away; that his attention was attracted by the flame. Describing the flame, he said:

"Well, just suddenly the bin burst into flames is what I saw."

He further testified that when he looked, there was a mass of flames; that he ran for the fire extinguisher and when he got to the bin the water system was working; that he started to work for appellant company in 1923; that he had never seen any flash-fire like that before.

Mr. Morey, the superintendent, testified that he had worked for appellant company since 1889; that the type of blower installed and in use was one generally used all over the country; that the heavier woolen stock had a tendency to drop down when carried through the blowers, while the finer cotton and rayon stock would float around in the air; that the custom and practice was for the men to leave the door partly

ajar; that the size of the opening would depend on the kind of stock blown into the bins; that the order had been given before August, 1932, to leave an opening, and many times he had seen the doors partly open prior to the accident; that he was in the carding room when the accident occurred; that all of a sudden a flash came—it was like an explosion—he did not remember hearing a noise; that the fire flashed out of the bin ten feet, and the sprinkler heads six feet away and the two in the bin went off, discharging water, and the fire went out; that he found the door in the bin open four to six inches; that he pushed it open; that plaintiff was lying on the material face down, with his feet toward and head away from the door; that he grabbed plaintiff's legs to pull him out; that there was hot water coming down from the sprinklers, but plaintiff's clothes were not burned, there was hot water on them.

He further testified that from the time he commenced working for the Island Woolen Company in 1889 to the day of the accident he had never seen a similar flash-fire occur in any of the bins; that he had visited other plants and talked with men in charge of other woolen mills, and prior to 1932 he had never heard of a like flash-fire occurring in a bin; that he had never received any complaints from any of the men about getting stuck or penned in the bins because they could not open the door from the inside; that the sliding door goes back and forth flush to the outside wall of the bin; that they could not use a swinging door because if it opened out it would close up the aisle.

He further testified that he did not know what was the cause of the explosion or the flash-fire; that it was all a guess, that no one knows.

Mr. McFetridge, president of the Island Woolen Company, testified that he commenced work in the mill in 1887 and had been there continuously since, except for a period of about six years; that they first installed a blower system in the early 90's; that up to August 8, 1932, he had never heard of or

seen a flash-fire in any of the bins in the company plant; that as an employee and as an executive he had been in touch more or less with the woolen and cotton-mill business and people engaged in similar business; and in conferences, conventions, conversations, and reading he had never heard of a flash-fire occurring in a bin; that the sprinkler system was inspected several times a year by the underwriters; that there was practically no fire damage to the material in the bin, what damage there was was caused by water.

Upon the undisputed facts, it cannot be said that the employer had notice, actual or constructive, that in the way the mill was being operated there was any danger to any employee working in the bins. Those connected with the mill and its operations for more than forty years had never experienced an explosive fire, nor had they ever heard of a like experience in any other mill. In *Kaczmarski v. F. Rosenberg Elevator Co.* 216 Wis. 553, 559, 257 N. W. 598, the court said:

"It has been held in several cases that an employer is not liable under the safe-place statute unless he has actual or constructive notice of a condition of maintenance that renders a place of work unsafe. The same rule in reason applies to owners. This rule has been applied in case of a person injured by stepping on a banana peel on a stairway, *Lundgren v. Gimbel Bros.* 191 Wis. 521, 210 N. W. 678; and one injured through lights being out at a stairhead, *Pettric v. Gridley Dairy Co.* 202 Wis. 289, 232 N. W. 595. This rule was also applied to an owner in a case of injury through lights being out at a stairhead of a leased restaurant, *Kinney v. Luebkeman,* 214 Wis. 1, 252 N. W. 282."

In *Pettric v. Gridley Dairy Co., supra,* p. 293, the court said:

"It would seem that in order to make an employer liable for defects in the nature of repair or maintenance he should

have either actual or constructive notice of such defects. Natural principles of justice would seem to require that."

To same effect see *Dierkes v. White Paving Co.* 229 Wis. 660, 666, 283 N. W. 446; *Sykes v. Bensinger Recreation Corp.* (7th Cir.) 117 Fed. (2d) 964.

The court below reversed the findings of the commission on the sole ground that there was no credible evidence to support the findings. We cannot so conclude. That a flash-fire occurred, and that plaintiff was immediately burned, is in accord with all the testimony, including that of the plaintiff.

On March 11, 1939, applicant (the plaintiff herein) filed his application with the Industrial Commission for the fifteen per cent penalty. He therein states:

"That while so engaged in the performance of said industry, a fire was ignited and the fine fabric constituting the stock suddenly ignited and enveloped the applicant in flames, rendering it impossible for me to escape from the inclosed bin."

While the cause of the fire is entirely a matter of speculation, all the witnesses agree as to the character of the fire, that it was a sudden flash-fire which enveloped the whole bin in which plaintiff was working. A further analysis of the testimony would seem unnecessary. The findings of the commission have ample credible support in the evidence. Where different inferences may be drawn from the facts, a question of fact is presented, and findings based upon different reasonable inferences are conclusive on review. *Lewis v. Industrial Comm.* 178 Wis. 449, 190 N. W. 101; *Tiffany v. Industrial Comm.* 225 Wis. 187, 273 N. W. 519.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment affirming the order of the Industrial Commission.